THE FOLLOWING ORDER
IS APPROVED AND ENTERED
AS THE ORDER OF THIS COURT:

DATED: September 30, 2010



Honorable Pamela Pepper
Chief United States Bankruptcy Judge

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF WISCONSIN

---

IN RE:     DEAN ANDREW DOLATA,        Case No. 08-32866-pp

                 Debtor.             Chapter 7

---

STARFIRE, INC.,                         Adv. Case No. 09-2056

                 Plaintiff,

v.

DEAN ANDREW DOLATA,

                 Defendant.

---

**MEMORANDUM DECISION FINDING IN FAVOR
OF PLAINTIFF STARFIRE, INC., AND FINDING DEBT
NONDISCHARGEABLE PURSUANT TO 11 U.S.C. §523(a)(4)**

---

I.     <u>**BACKGROUND**</u>

     A.     <u>Procedural History</u>

     The defendant, Dean Dolata, co-owner of Quality Fire Protection, Inc.

("Quality"), filed his individual Chapter 7 petition on November 24, 2008. Case

1

no. 08-32866-pp, docket no. 1. (Quality had filed a Chapter 7 petition eight months earlier, case no. 08-22398-pp, docket no. 1, and the co-owner of Quality, John Steiner, had filed an individual Chapter 7 petition in the Western District of Wisconsin three weeks earlier, on November 5, 2008, case no. 08-15859-rdm, docket no. 1.)

On January 10, 2008, the plaintiff sued Quality in Milwaukee County Circuit Court in attempt to recover funds owed for supplies it had sold to Quality. Starfire, Inc. v. Quality Fire Protection, Inc., et al., Milwaukee County Circuit Court, case no. 2008-CV-580. The circuit court dismissed that case on November 25, 2008, the day after the defendant filed bankruptcy.

On February 10, 2009, several months after the defendant filed bankruptcy, the plaintiff filed this adversary proceeding. (The next day, the plaintiff filed a similar complaint against Steiner in the Western District of Wisconsin. Case no. 09-0030-rdm.) The complaint alleged that the defendant owed the plaintiff $97,158.81 for funds that he had misappropriated, in violation of the Wisconsin theft-by-contractor law (Wis. Stat. §779.02(5)) and §523 of the Bankruptcy Code. The Court conducted a trial on January 14, 2010.

    B.    <u>Factual Background</u>

        1.    The relationship between Quality and the plaintiff.

The plaintiff, Starfire, Inc., is a Wisconsin business that sells and distributes fire protection equipment and materials. Docket no. 1 at 1.

Defendant Dean Dolata was, at the time of the events in question, an officer of Quality, which designed and installed fire protection systems. According to his testimony at trial, the defendant owned 46% of Quality, which regularly purchased fire protection supplies from the plaintiff. The defendant testified that Steiner, who was president of Quality from December 2006 to March 2008, also owned 46%, and that there were two other small minority owners.

Between January 2007 and June 2007, the plaintiff invoiced Quality for supplies that Quality purchased from the plaintiff to use on forty-two separate jobs. Docket no. 21, Plaintiff's Exhibit 13. Scott Mathwig, an employee of the plaintiff, testified that each invoice contained the following provision: "This invoice is subject to an interest charge of 1.5% per month if not paid within specified terms." *See, e.g.* docket no. 20, Plaintiff's Exhibit 4. He also testified that Starfire stopped delivering materials to Quality in July 2007, after the accounts had been past due for over 120 days, but that Quality continued to make payments from July 2007 until November 2007.

On December 13, 2007, the plaintiff send Quality a demand letter for the past due amounts, directing it to the attention of Steiner and the defendant. Docket no. 20, Plaintiff's Exhibit 1. The letter indicated that the plaintiff had made repeated attempts to collect on the account. Id. It gave Quality seven days to bring its accounts current, or the plaintiff would alert each job's general contractor of the plaintiff's intent to file liens on the properties. Id. (Mathwig testified at trial that Starfire never ended up alerting any of the

3

general contractors to Quality's past due status.)  The letter included an attached job summary showing amounts due for thirty-seven accounts, and an attached job detail list reflecting the various charges applied to each account.[1] Id.

Steiner testified that shortly after the plaintiff issued its demand letter, Mathwig and the owner of the plaintiff, a Mr. Mallock, had requested a meeting.  At that meeting, Steiner testified, he had informed Mathwig and Mallock about Quality's plan first to clear up tax debts it owed the IRS, then to obtain the small business loan, and finally to use the proceeds from the small business loan to pay in full the balance owed to the plaintiff.  At this point, according to Steiner, the plaintiff requested that Steiner and the defendant sign personal guarantees.  (Steiner testified that he and the defendant had refused to sign the personal guarantees.)

---

[1]The job detail attached to the December 13, 2007 demand letter lists only thirty-seven jobs.  Docket no. 20, Plaintiff's Exhibit 1.  The defendant's job summary also lists only thirty-seven jobs, and lists ABC Catalog twice.  Docket no. 23, Defendant's Exhibit 140.  However, Scott Mathwig, testifying for the plaintiff at trial, stated that there were forty-two jobs in question, and Plaintiff's Exhibit 2 is a list of amounts owed on those forty-two jobs.  The missing four jobs and corresponding amounts are: Aromi Café ($266.58), Beneficial Finance ($189.14), Rockwood ($349.31), Walgreens - McFarland ($3,187.97).  *Compare* Docket no. 20, Plaintiff's Exhibit 1, *and* Plaintiff's Exhibit 2, *with* docket no. 23, Defendant's Exhibit 140.  The total amount owed for the missing jobs is $5,278.23.  Oddly enough, the total amount the parties show as due and owing is roughly the same, regardless of the source (Defendant's Exhibit 140 indicates that $97,145.92 is due, and Plaintiff's Exhibits 1, 2, and 3 indicate that $97,158.81 is due–a difference of $12.89).  Given that the total arrearage amounts are approximately the same, the Court is not sure what to make of this discrepancy in the number of jobs and past due amounts.

4

On January 10, 2008, less than one month after the plaintiff issued the demand letter, the plaintiff sued the defendant, Steiner and Quality in state court. Starfire, Inc. v. Quality Fire Protection, Inc., et al., Milwaukee County Circuit Court, case no. 2008-CV-580. The defendant testified that on March 17, 2008–the day Quality filed its bankruptcy petition and approximately two months after the plaintiff filed suit against it–Quality ceased operations.

    2.    The decline in Quality's financial fortunes.

Steiner testified at trial that Quality was a very profitable business in 2006 and 2007, but that in 2007, he and the defendant were forced to contribute additional funds to the business. The defendant later confirmed in his testimony that the two had contributed $50,000 each to Quality in 2007, and that neither had taken a distribution from the prior year's profits. The defendant testified that he was not a particularly sophisticated businessman. He conceded that Quality did not set up a separate account for payments Quality received from owners or general contractors for materials; rather, Quality used one checking account for all transactions.

As to what had happened to the funds Quality had received from owners, the defendant testified that he and Steiner each took a "standard payroll check" from Quality of $85,000 (reduced to $70,000 in April or May of 2007) at M&I Bank's recommendation. (Although the defendant did not state as much at trial, it appears that this was a one-time draw.) He also testified that Quality owed the IRS money, and that in September 2007 he had explained to Mathwig

5

that once Quality paid off the IRS, it would pay Starfire in full. Finally, the defendant testified that Quality had a pending small business loan application with M&I Bank, and that Quality needed to pay the IRS debt before the bank would approve the loan.

>        3.    The unpaid funds.

According to Quality's September 9, 2008 "Job Summary," which summarized Quality's jobs, costs, and amounts owed to the plaintiff, the defendant initially owed the plaintiff a total of $262,503.43 for all of the supplies it provided for all 42 jobs. Docket no. 20, Plaintiff's Exhibit 3. The same document shows that Quality paid the plaintiff $165,344.62 in partial payments on twenty-one of the jobs, leaving $97,158.81 unpaid. Id. Steiner testified that Quality generally paid Starfire on its debts in chronological order, as it was a revolving account.

Mathwig testified that sometimes, owners would make "owner-direct purchases" from Starfire. These were instances where owners or general contractors arranged to pay the plaintiff directly for the supplies, rather than channeling the funds through Quality. He testified that if the plaintiff was aware of an "owner-direct" arrangement before it shipped supplies, it would set up a separate account with the owner or general contractor, and deposit the payments in that separate account. If, however, the plaintiff learned of the owner-direct arrangement after it already had shipped the supplies, Mathwig testified that the plaintiff would accept the direct payment from the owner, but

6

would apply it to Quality's account for the corresponding job. Mathwig testified that on occasion, owners would send a purchase order directly to the plaintiff, but that if such an account became more than 90 days past due, Quality was required to pay the plaintiff for the order, and the plaintiff later would credit Quality once the owner made the payment.

Steiner testified that the $97,158.81 past-due figure did not account for several owner-direct purchases. He testified that the plaintiff had received payment directly from owners on three jobs: Camp Douglas ($923.39), YMCA ($466.66), and Waunakee Police ($5,936.24)–a total of $7,306.29. See docket no. 23, Defendant's Exhibit 140. The defendant further testified that for the Waunakee Police job, Quality did not receive any payment for materials, although it received funds for labor.

In contrast, Mathwig testified that the $97,158.81 figure did account for owner-direct payments. Quality's QuickBooks records showed that Quality received payment in full for each of the three jobs in dispute. Docket no. 21 at 102 (QuickBooks record regarding Camp Douglas job); docket no. 21-1 at 186 (QuickBooks record regarding YMCA job); and docket no. 21-1 at 172 (QuickBooks record regarding Waunakee Police Station job).

    4.    The conflicting profit-and-loss statements.

The day after the plaintiff filed this adversary complaint, it also filed a complaint against Steiner, whose bankruptcy case was pending in the Western District of Wisconsin. During the trial in that case, Quality introduced the

7

document that, for the trial in this case, was marked Plaintiff's Exhibit 22. The document was a QuickBooks Profit & Loss statement for Quality, which purported to reflect Quality's profits and losses for January 2007 through December 2007. It was created by the defendant and Steiner, and the court admitted it as an exhibit in the Western District trial. <u>Starfire v. John Steiner</u>, Adv. case no. 09-0030-rdm.

Defendant's Exhibit 133 is also a QuickBooks Profit & Loss statement for Quality. It also purports to reflect Quality's profits and losses for January 2007 through December 2007, and again, was created by the defendant and Steiner. This exhibit, however, was created for the trial in this case. The figures on the two exhibits, while purporting to reflect the profits and losses of the same company for the same time period, were quite different, as demonstrated by the chart below.

8

**Summary of Quality's 2007 P & L Statements**
**(Plaintiffs Ex. 22 and Defendant's Ex. 133 Comparison)**

|  | Exhibit 22 | Exhibit 133 |
|---|---|---|
| **Creation Date** | July 4, 2008 | October 5, 2009 |
| **Total Income** | 3,907,924.67 | 3,907,924.67 |
| **Total COGS** | 3,215,358.19 | 3,829,926.01 |
| **Gross Profit (Income minus COGS)** | 692,566.48 | 77,998.66 |
| **Total Expenses (Overhead)** | 947,458.57 | 377,114.76 |
| **Net Ordinary Income (Gross Profit minus Total Expenses)** | -254,892.09 | -299,116.10 |
| **Net Other Income/Expense** | -346.61 | -346.61 |
| **Net Income/Loss (Net Ordinary Income minus Net Other Income/Expenses)** | -255,238.70 | -299.462.71 |
| **Gross Profit Margin (%)** | 17.72% | 1.99% |
| **Overhead (% of Rev.)** | 24.24% | 9.65% |

At the conclusion of John Steiner's trial, the Western District court found that Steiner had taken funds that owners had given Quality for the purpose of paying for materials the plaintiff had supplied, and had used those funds to pay Quality's overhead. The court held that this was a misappropriation of

9

trust funds pursuant to Wis. Stat. §770.02(5). At the trial in this case, Steiner and Dolata each testified that after this decision, and in preparation for the trial in this case, they went through each expense in Plaintiff's Exhibit 22 (i.e. bad debt, employee welfare, retirement benefits, rent, electrical), left the true overhead costs in the "total expenses" category, and moved job-specific expenses into the Cost of Goods Sold, or "COGS," category. Steiner testified that he had realized after the Western District trial that in trying to maintain a high gross profit margin percentage in their profit-and-loss statement, he and the defendant had created a profit and loss statement (Plaintiff's Exhibit 22) that erroneously reflected an inflated overhead percentage, and that the changes they made to those figures in creating Defendant's Exhibit 133 resulted in an overhead percentage figure more in line with industry standards (approximately 9%).

Starfire argued at the trial in this case that as a result of Steiner losing the Western District litigation, Steiner and the defendant had realized that their original profit and loss statement–Plaintiff's Exhibit 22–proved that they had committed theft by contractor, and thus, defalcation in a fiduciary capacity. Accordingly, the plaintiff argued, they'd tinkered with the P&L statement after the fact, to make the numbers look less incriminating. Further, the plaintiff argued that even a 9% overhead rate was out of line with industry standards. Mathwig testified that the plaintiff's overhead percentage generally was between 4-5%, and that the plaintiff's affiliate company, Starfire

10

Systems Inc., had an average overhead percentage of approximately 15%. He testified that the affiliate's overhead percentage was more comparable to that of a company like Quality (the installer of fire prevention systems, and not just a materials supplier), because like Quality, the affiliate had more significant insurance requirements and other expenses associated with design and installation.

When asked why, if Quality could afford to carry overhead that was 9% of its budget, it could not pay the plaintiff what it owed, Steiner responded that in 2007, the company had experienced a loss of around $300,000.

The defendant repeatedly testified that although he had prepared Defendant's Exhibit 133, he was not an accountant. He also testified that although his accountant, Duane Johnson, could have prepared Defendant's Exhibit 133, Johnson did not prepare any of the exhibits in preparation for this trial.

II.    **JURISDICTION**

This case involves a proceeding to determine the dischargeability of a particular debt. As such, it is a "core proceeding arising under title 11," pursuant to 28 U.S.C. §157(b)(2)(I), and this Court has jurisdiction to hear it. *See also* 28 U.S.C. §1334(a).

11

III.   **LEGAL ANALYSIS**

    A.   Burden of Proof

The creditor bears the burden of proving, by a preponderance of the evidence, that a debt is nondischargeable.  Matter of Bero, 110 F.3d 462, 465 (7th Cir. 1997) (*citing* Grogan v. Garner, 498 U.S. 279 (1991)).  In discharge exception cases, courts are to construe the evidence strictly against the creditor.  Goldberg Secs., Inc. v. Scarlata (Matter of Scarlata), 979 F.2d 521, 524 (7th Cir. 1992); Matter of Bero, 110 F.3d at 465.

    B.   The plaintiff has proven by a preponderance of the evidence that the defendant incurred the debt as a result of committing defalcation while acting in a fiduciary capacity in violation of 11 U.S.C. §523(a)(4).

The plaintiff's complaint asked the Court to find that the defendant's debt "is not dischargeable under 11 U.S.C. §523."  Docket no. 1, at 3.  Section 523 of the Bankruptcy Code lists a number of exceptions to discharge, many of which are inapplicable to the facts of this case.  While the complaint did not expressly state which §523 cause of action the plaintiff was pursuing, the facts hinted at a violation of §523(a)(4), fraud or defalcation in a fiduciary capacity. The complaint alleged that the defendant,

> owes plaintiff the sum of $97,158.81 for the ... trust funds that were misappropriated, misused, and misapplied... [The plaintiff also alleged that the defendant] knowingly contained, concealed, or used contractor trust funds without the plaintiff's consent, contrary to its authority, with intent to convert such funds to his own use and purpose or the use of another...

Docket no. 1, at 3.

In their Joint Pretrial Report, the parties clarified the relevant cause of action, asking that the Court determine whether the defendant's debt was "not dischargeable under [11] U.S.C. §523(a)(4) for defalcation while acting in a fiduciary capacity." Docket no. 12, at 2.

Section 523(a)(4) of the Bankruptcy Code excepts from discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." The purpose of this provision, as articulated in the Supreme Court's decision in <u>Cohen v. de la Cruz</u>, is to prohibit "debtors from discharging liabilities incurred on account of their fraud, embodying a basic policy animating the Code of affording relief only to an 'honest but unfortunate debtor.'" <u>Cohen v. de la Cruz</u>, 523 U.S. 213, 217 (1998).

There are three elements that a plaintiff must prove by a preponderance of the evidence in order to prove a §523(a)(4) nondischargeability claim: (1) that a trust existed; (2) that the defendant was a fiduciary of that trust; and (3) that the defendant committed "fraud or defalcation" while acting as a fiduciary of the trust. <u>Chase Lumber & Fuel Co. v. Koch (In re Koch)</u>, 197 B.R. 654, 656 (Bankr. W.D. Wis. 1996); *see also*, <u>In re Eisenberg</u>, 189 B.R. 725, 730 (Bankr. E.D. Wis. 1995). The Court concludes that the plaintiff has met its burden as to all three of those elements.

13

1. *The plaintiff has proven that a trust existed for funds the defendant received in thirty-seven of the forty-two jobs.*

In nondischargeability proceedings, "bankruptcy courts look to state law to determine whether the requisite trust relationship exists." Fischer Constr., LLC and Team Fischer, Inc. v. Ecker (In re Ecker), 400 B.R. 669, 671-72 (Bankr. E.D. Wis. 2009), *citing* In re Bowles, 318 B.R. 129, 138 (Bankr. E.D. Wis. 2004). Accordingly, the Court looks to Wisconsin law to determine whether a trust existed under the facts in this case.

Wis. Stat. §779.02(5) provides, in relevant part:

> **Theft by Contractors.** [A]ll moneys paid to any prime contractor or subcontractor by any owner for improvements, constitute a trust fund only in the hands of the prime contractor or subcontractor to the amount of all claims due or to become due or owing from the prime contractor or subcontractor for labor, services, materials, plans, and specifications used for the improvements, until all the claims have been paid . . . . The use of any such moneys by any prime contractor or subcontractor for any other purpose until all claims . . . have been paid in full or proportionally in cases of a deficiency, is theft by the prime contractor or subcontractor of moneys so misappropriated and is punishable under s. 943.20. If the prime contractor or subcontractor is a corporation, limited liability company, or other legal entity other than a sole proprietorship, such misappropriation also shall be deemed theft by any officers, directors, members, partners, or agents responsible for the misappropriation.

Wis. Stat. §779.02(5).

Stated succinctly, §779.02(5) provides that when an owner pays money to a prime or subcontractor for improvements, the money constitutes a trust fund in the hands of that prime or subcontractor. The beneficiaries of such a trust are the "laborers, suppliers and materialmen," as well as "owners and

14

contractors." *See* <u>Matter of Thomas,</u> 729 F.2d 502, 506 (7th Cir. 1984). To determine whether a trust existed in this case, then, the Court must examine whether (1) an owner (2) paid monies (3) to a prime or subcontractor (4) for improvements.

The parties do not dispute three of these four elements. They agree that owners of the jobs paid monies. Both parties testified about general contractors or owners who hired Quality. Also, the plaintiff's December 13, 2007 demand letter threatened to alert "all the General Contractors in the area" to Quality's account status with the plaintiff, which necessarily implies that Quality was doing business with such contractors. Docket no. 20, at 7. Nor do the parties dispute that Quality was either a prime or subcontractor for installing fire protection systems at these jobs. Nor do the parties dispute whether the majority of the funds the owners paid were for improvements–specifically, materials provided by the plaintiff. Plaintiff's Exhibits 1, 2 and 3, as well as Defendant's Exhibit 140, listed the jobs that were the "improvements" for which the supplies the plaintiff provided Quality were to be used.

The issue the parties disputed with regard to some of the 42 jobs was whether the owners paid monies *to the defendant*, or to someone else, for those materials.

The forty-two jobs in question fall into five categories: (1) twenty-three jobs for which the defendant admitted that Quality received full payment from

the general contractor or owner; (2) eleven jobs for which the defendant maintained that Quality received only partial payment from the general contractors or owners; (3) three jobs for which the parties dispute whether the plaintiff received payments directly from the owners, or whether those payments went through Quality; (4) four jobs for which there was no information about how the owners made the payments; and (5) one "job" that doesn't appear to have been a job at all, but appears to have been an invoice for supplies ordered directly from the plaintiff for Quality's own use.

> a. The plaintiff has proven that a trust existed for each of the twenty-three jobs for which Quality received full payment from the general contractor.

The defendant conceded that Quality received payment in full from the respective general contractors for twenty-three jobs.[2] *See, e.g.* docket no. 22 at 98, Plaintiff's Exhibit 21; docket no. 23 at 95, Defendant's Exhibit 140. Therefore, because (1) general contractors/owners (2) paid monies to (3) the subcontractor (Quality) (4) in full for improvements, the funds Quality received for these twenty-three jobs constituted trust funds.

> b. The plaintiff has proven that a trust existed for each of eleven partial-payment jobs, to the extent that Quality

---

[2]The twenty-three payment-in-full jobs were: ACM-Mulehide, Arch Aluminum, Beck Container, Bob Jewell, Cabinet World / Richco Retail, Caravilla, City Wide Recycling, Endeavor / Froggie Day Care, Fond du Lac Center, Fruitcrown, Goff Auto / Collision, ITT Flygt, Kohl's, Lefleur Gymnastics, Malacara, Maxies, Medovations, Milwaukee Antique Center, Plaza Court, Rodian Insurance, Siemans, Trans Pak, and Vitthoa Market. Docket no. 23, at 95, Defendant's Exhibit 140.

Case 09-02056-pp   Doc 32   Filed 10/01/10   Page 16 of 41

received partial payments for those jobs.

Under §779.02(5), a trust exists only to the extent that an owner paid money to the prime or subcontractor. The defendant indicated in Exhibits 21 and 140 that for eleven of the forty-two jobs, Quality received only partial payments from the respective general contractors.[3] (Although the plaintiff offered Exhibit 21 into evidence, Mathwig testified that it was created by Quality, and introduced by Quality at Steiner's Western District trial.) According to Exhibit 21, Quality received $479,338.34 in partial payments for the eleven jobs. Docket no. 22 at 98, Plaintiff's Exhibit 21. To the extent that the defendant, through Quality, received payments–even if only partial payments–from an owner or contractor for improvements, a trust existed. Thus, the $479,338.34 in partial payments Quality received for eleven of the jobs were trust funds.

> c.   The plaintiff has proven that a trust existed for the three disputed jobs.

The plaintiff contended that the defendant received payments from the owner for three more jobs–Camp Douglas ($923.39), Waunakee Police ($5,936.24), and YMCA ($466.66). Docket no. 23, at 95, Defendant's Exhibit 140. The defendant responded that the owners of those jobs paid the plaintiff

---

[3]The eleven partial payment jobs were: ABC Catalog, Capital Crossing, Goodyear, Green Lake Lodge, Ixonia State Bank, Larry Webb, Luxury Apartments, Pick-N-Save, Southern Oaks, Village Square North, and W. Center.

17

directly, and that the money never passed through Quality.

Scott Mathwig testified for the plaintiff that if the plaintiff was aware of an owner-direct payment arrangement before it shipped supplies, it would set up a separate account with the owner or general contractor and apply payments to that separate account. He further testified that if the plaintiff learned that the owner planned to pay it directly *after* it already had shipped the supplies, it would accept the direct payment from the owner, but then would credit the payment to Quality's account for the corresponding job. Finally, Mathwig testified that the $97,158.81 figure the plaintiff claimed as a nondischargeable debt was the amount of the debt Quality owed after the plaintiff accounted for any owner-direct payments it had received.

In contrast, Steiner, testifying for the defendant, stated that the $97,158.81 which the plaintiff claimed was past due did not account for $7,306.29 in owner-direct payments to the plaintiff for the three above-referenced jobs.

The documentary evidence disputes Steiner's version of events. Plaintiff's Exhibit 13, contains Starfire's invoices for the three disputed jobs--Camp Douglas, Waunakee Police, and YMCA. Each of the invoices for each of those jobs indicates, "Sold To: Quality Fire Protection." Each one indicates, "Ship To: Quality Fire Protection." In addition, Plaintiff's Exhibit 13 contains "Customer QuickReports" from Quality's QuickBooks records for each of those jobs. The "Customer QuickReports" for each job indicates that Quality

18

received payments for that job.  Further, for each of those jobs, there's a QuickBooks "Profit & Loss by Job" page.  On the YMCA page, there is an income category entitled "Sales - Owner Direct - Starfire."[4]  The amount listed is in that category is "$0."  Finally, attached to Plaintiff's Exhibit 1 (the demand letter from the plaintiff to Quality) is a QuickBooks document entitled "Quality Fire Protection Job Detail," updated December 13, 2007.  That document lists every invoice by date and invoice number, as well as by the job number Starfire gave it, the job name, and the job total.  It shows the Camp Douglas Starfire debt of $923.39 under the job total.  It shows the YMCA Starfire debt of $466.66 under the job total.  It shows the Waunakee Police Starfire debt of $5,936.24 under the job total.

The invoices show that the plaintiff sold goods for these jobs to Quality, and shipped them to Quality.  The defendant's own records show that the defendant was paid by the owners for these jobs, and that Quality had accrued debts to the plaintiff for the jobs.  The only evidence indicating that the owners paid the plaintiff directly for these jobs is Steiner's trial testimony, and that testimony simply does not comport with Quality's records.

Accordingly, the plaintiff has proven that Quality received funds from the owners on those three jobs (full payment), and that those funds constituted trust funds.

---

[4]  Oddly, this category does not appear on any other "Profit & Loss by Job" statements for any other jobs.

Case 09-02056-pp    Doc 32    Filed 10/01/10    Page 19 of 41

> d. The plaintiff did not prove that a trust existed for each of the four jobs on which the defendant did not either concede or deny payment.

The plaintiff alleged that the defendant owed it money for the following four jobs: Aromi Café ($266.58), Beneficial Finance ($189.14), Rockwood ($349.31), and Walgreens ($3,187.97). Docket no. 20 at 14, Plaintiff's Exhibit 2. Plaintiff's Exhibit 13, which consisted of individual invoices for each of the forty-two jobs, included invoices from the plaintiff to Quality for each of these jobs.[5] Docket no. 21. Neither party produced any testimony regarding how the owners/general contractors paid for these jobs.

The QuickBooks "Job Summary" updated December 13, 2007 does not show these four jobs. Docket no. 20 at 9, Plaintiff's Exhibit 1. It should, given the invoice dates: the Aromi Café invoice showed a ship date of May 23, 2007 and a due date of June 22, 2007; the Beneficial Finance invoice showed a ship date of May 15, 2007 and a due date of June 14, 2007; the Rockwood invoice showed a ship date of May 31, 2007 and a due date of June 30, 2007; and the Walgreen's invoices, of which there were several, showed ship dates in May 2007 and due dates in June, 2007.

The second page of the QuickBooks "Job Summary" attached to Plaintiff's Exhibit 2, updated September 9, 2008–nine months later–reflects all

---

[5]*See* docket no. 21 at 66-7 for Aromi Café invoices; docket no. 21 at 73-4 for Beneficial Finance invoices; docket no. 21-1 at 117-121 for Rockwood invoices; and docket no. 21-1 at 161-170 for Walgreens invoices.

20

four of these jobs, but does not show anything in the "partial payments received" column. This implies that Quality had not received payments from owners for these jobs as of September 2008. The first page of the QuickBooks "Job Summary" in Exhibit 2, updated September 8, 2008 and containing a handwritten notation stating, "This is a summary of the unpaid amounts due to Starfire," shows all four jobs. Again, however, all this document demonstrates is that Quality owed Starfire the money–it does not show that owners gave Quality funds for the Starfire supplies.

Accordingly, the plaintiff did not meet its burden of proving that the funds Quality received for these jobs were trust funds.

   e. The plaintiff did not prove that a trust existed for the one job that appeared to be supplies purchased for Quality.

According to Plaintiff's Exhibit 2, Quality owes the plaintiff $648.38 for "Stock." Docket no. 20 at 14, Plaintiff's Exhibit 2. Plaintiff's Exhibit 21, prepared by the defendant but introduced into evidence in this case by the plaintiff, indicates that Quality owes the plaintiff $648.38 for the "Shop Account." Docket no. 22 at 136. Based on the description of this "job," it appears to be a debt that Quality owes the plaintiff for materials that Quality purchased, not for any particular job, but for Quality's general use. Neither party presented any evidence proving that an owner or general contractor provided monies to Quality for this "job," or indeed, that it even was a "job." *See, e.g.* docket no. 22 at 98, Plaintiff's Exhibit 21; docket no. 23 at 95,

21

Defendant's Exhibit 140. Because the plaintiff did not prove that this debt involved monies paid by an owner to a prime contractor for improvements, no trust exists as to this debt.

### f. Conclusion

Accordingly, the Court concludes that the plaintiff has met its burden of proving that a trust existed for thirty-seven out of the forty-two jobs. The plaintiff did not meet its burden of proving that a trust existed as to the remaining five jobs.

> **2.** *The plaintiff has proven that the defendant was a fiduciary of the above-described trust funds.*

The second element of a theft-by-contractor claim is that the defendant must be a fiduciary of the trust. Chase Lumber & Fuel Co. v. Koch, 197 B.R. at 656. The plaintiff has proven this element.

As noted above, §779.05 creates a trust "in the hands of the prime contractor or subcontractor" who receives the money from the owner. The evidence demonstrated that Quality was the "prime contractor or subcontractor" who received the monies from the owners to pay for materials purchased from the plaintiff. The Seventh Circuit has held that the "beneficiaries of such a trust are the laborers, suppliers and materialmen," as well as "owners and contractors." *See* Matter of Thomas, 729 F.2d at 506. There is no dispute that the plaintiff was one of the "materialmen" supplying materials for the jobs Quality was performing. Quality, therefore, was a

22

"fiduciary" of the trusts described above.

The defendant in this case is not Quality, but one of its two majority owners. Section 779.02(5) provides that "[i]f the prime contractor or subcontractor is a corporation, such misappropriation also shall be deemed theft by any officers, directors or agents of the corporation responsible for the misappropriation." Wis. Stat. §779.02(5). *See also*, Romes Design, Inc. v. Dinkins (In re Dinkins), 327 B.R. 918, 923 (Bankr. E.D. Wis. 2005) ("If an individual debtor is an officer, director, or agent responsible for misappropriation by an entity, the debt will be excepted from the discharge of the individual.").

Quality Fire Protection, Inc. was a corporation. Not only did the defendant testify at trial that he was the 46% owner of Quality, but he admitted in his answer to the complaint that he was an officer and/or director of the corporation until the time it ceased operating in March 2008. Docket no. 5, at 1, para. 2. Therefore, because Quality was a fiduciary of the trust funds, the defendant in his capacity as officer and/or director of Quality also was a fiduciary of the trust.

3. *The plaintiff has proven that the defendant committed "fraud or defalcation" while acting as a fiduciary of that trust.*

The third element of a theft-by-contractor claim is that the defendant committed fraud or "defalcation" while acting in a fiduciary capacity. Chase Lumber & Fuel Co. v. Koch, 197 B.R. at 656. The plaintiff proved at trial, by a

23

preponderance of the evidence, that the defendant committed defalcation by using the funds Quality received from owners for purposes other than paying the plaintiff.

A fiduciary commits defalcation when he uses trust funds for something other than paying the subcontractors whose supplies are used to make the improvements.  *See, e.g.*, Bastian v. Roy, 20 Wis.2d 470, 482-3 (Wis. 1963); Capen Wholesale, Inc. v. Probst, 280 Wis.2d 354, 363 (Ct. App. 1993); Matter of Thomas, 729 F.2d at 505-6.  The Seventh Circuit, in its 1994 decision in Meyer v. Rigdon, held that

> a mere negligent breach of a fiduciary duty is not a "defalcation" under section 523(a)(11). "It is a well recognized principle in bankruptcy law that exceptions to discharge are strictly construed against the objecting creditor and in favor of the debtor. This is based on the strong policy of the Bankruptcy Code of providing a debtor with a 'fresh start.'" In re Marvin, 139 B.R. 202, 205 (Bankr. E.D. Wis.1992) (*citing* Gleason v. Ihaw, 236 U.S. 558, 35 S.Ct. 287, 59 L.Ed. 717 (1915)). Given this well-recognized principle, and the split of authority concerning whether a "defalcation" may result from negligence, we cannot say that Congress intended for a debt arising from a mere negligent breach of fiduciary duty to be excepted from discharge under section 523(a)(11).

Meyer v. Rigdon, 36 F.3d 1375, 1385 (7th Cir. 1994).

Judge Martin analyzed the Meyer case two years later in Chase Lumber & Fuel Co. v. Koch, conceding that the Seventh Circuit case was imprecise regarding the proper standard of care that bankruptcy courts should apply. 197 B.R. at 658.  He concluded that the Meyer case suggested "that something akin to 'reckless' may be the appropriate standard," and in his case, found that

24

"more than mere negligence" was the correct standard.  Id.  This Court agreed

with his reasoning in Ganther Constr., Inc. v. Ward (In re Ward), 417 B.R. 582,

592 (Bankr. E.D. Wis. 2009), and again in Levine v. Ward (In re Ward), 425

B.R. 507, 526 (Bankr. E.D. Wis. 2010).

Here, the defendant's use of the trust funds for purposes other than

paying the plaintiff constituted defalcation.  There were forty-two jobs in

question.  A trust existed, and the defendant was a fiduciary of that trust, for

thirty-seven of the forty-two jobs.  Those thirty-seven jobs fall into two

categories: (1) twenty-six jobs where the defendant received full-payment;[6] and

(2) eleven jobs where the defendant received partial payments.[7]

The defendant's failure to pay the plaintiff the entire amount owed it for

the twenty-six full-payment jobs constituted "more than mere negligence."  The

defendant admitted that Quality received full payment from owners for twenty-

three of these jobs.  The documentary evidence proved that Quality received full

---

[6]The twenty-six payment-in-full jobs consisted of ACM-Mulehide, Arch
Aluminum, Beck Container, Bob Jewell, Cabinet World / Richco Retail,
Caravilla, City Wide Recycling, Endeavor / Froggie Day Care, Fond du Lac
Center, Fruitcrown, Goff Auto / Collision, ITT Flygt, Kohl's, Lefleur
Gymnastics, Malacara, Maxies, Medovations, Milwaukee Antique Center, Plaza
Court, Rodian Insurance, Siemans, Trans Pak, Vitthoa Market, Camp Douglas,
YMCA and Waunakee Police Station.  Docket no. 23 at 95, Defendant's Exhibit
140; docket no. 21 at 102, docket no 21-1 at 172, 186.

[7]The eleven partial payment jobs were: ABC Catalog, Capital Crossing,
Goodyear, Green Lake Lodge, Ixonia State Bank, Larry Webb, Luxury
Apartments, Pick-N-Save, Southern Oaks, Village Square North, and W.
Center.

25

payment from the owners of an additional three jobs. The defendant testified at trial, however, that in spite of the fact that Quality owed the plaintiff on these jobs, he and Steiner each took $70,000 paychecks. And, as the Court will discuss below, the evidence demonstrated that Quality used the funds the owners had given it to pay its own overhead expenses–exactly the kind of behavior that §779.02(5) was enacted to prevent.

        a.    *Payments to the defendant and Steiner.*

The defendant and Steiner each took a payment of $85,000–later reduced to $70,000–to pay themselves. In his closing statement at trial, counsel for the defendant argued that the Wisconsin Supreme Court's decision in State v. Keyes, 750 N.W.2d 30 (Wis. 2008) allowed this, standing for the proposition that a contractor could pay itself before paying other subcontractors. The Court disagrees.

State v. Keyes involved two general contractors, Angela and Matthew Keyes, who contracted to build a home for a couple. Id. at 33. The couple financed the project through a bank construction loan, and the Keyes drew from that loan seven times, for a total of $417,647. Id. Lien releases indicated that they paid $217,155.43 of that to subcontractors. Id. Problems arose when the couple learned that some subcontractors had not been paid, and that Angela Keyes was doing some of the subcontracting work herself. Id.

The evidence eventually revealed that Angela Keyes "had paid herself $75,000 for materials, with approximately $35,000 of that amount

26

unaccounted for." Id. at 33. The Keyes argued that Angela "was acting as a subcontractor," and that the payments she received did not include her "profit," but were for materials she provided for the project. Id. They further argued that as long as the money had gone toward the project, they had not violated §779.02(5). Id. at 36-37.

The Supreme Court disagreed with the Keyes' reading of the statute. The court found that even if it were to assume that Angela Keyes was a subcontractor, and was entitled to payment pursuant to her agreement with the couple, the Keyes' actions "conflict[ed] with the language of the statute." Id. at 37. The Court pointed out that §779.02(5) prohibits a fiduciary from using trust funds for any other purpose until all claims have been paid in full "or proportionally in cases of a deficiency." Id., *quoting* Wis. Stat. §779.02(5). The court found that there was a deficiency, and that "the unpaid subcontractors were not compensated proportionally to Angela." Id. The court concluded, therefore, that for the Keyes to "[u]s[e] the money to pay themselves in full while other subcontractors have not been paid proportionally constitutes using money for a non-statutory purpose." Id. at 38.

The statement upon which the defendant seizes in support of his contention that Keyes allows him to pay himself before paying the plaintiff can be found in the latter part of the Keyes decision. The Supreme Court noted that the Court of Appeals had asked the parties to brief "whether §779.02(5) prohibits a prime contractor acting as a subcontractor from paying itself for

27

profit on materials supplied as a subcontractor." Id. at 39. The court concluded, for reasons not relevant here, that §779.02(5) did not prohibit "prime contractors acting as subcontractors from receiving profit prior to paying other subcontractors for their labor and materials." Id. at 41.

Even assuming that Quality was acting as a subcontractor, there is no evidence that the $70,000 each that the defendant and Steiner paid themselves constituted "profit." Indeed, the defendant testified that in 2007–when he and Steiner took these payments–Quality was struggling.

Further, the Keyes dicta stated that the statute did not prohibit prime contractors acting as subcontractors from receiving profit "prior to paying other subcontractors for their labor and materials." Id. It did not say that such prime contractors could receive profit instead of paying subcontractors for their labor and materials.

Finally, the Keyes found that Angela Keyes did not pay subcontractors proportionally to what she paid herself. Id. at 37. If one accepts that this is what the "proportionally" language in §779.02(5) means–that the prime or subcontractor must pay subs proportionally to paying itself, as opposed to proportionally to what it receives from owners–then there was no proof that the $70,000 the defendant paid himself was "proportional" to what Quality paid the plaintiff.

The defendant also argued that §779.02(5) does not require that the prime contractor wait until every project is completed before paying its officers

a reasonable salary. He argued that for the law to require a prime contractor to wait until every job was completed and every subcontractor paid in full before paying its officers' salary would result in prime contractors going out of business. Section 779.05(2), however, specifically states that "[a]ny such misappropriated moneys which have been received as salary... shall be a civil liability of that person and may be recovered and restored to the trust fund specified in this subsection by action brought by any interested party for that purpose." So even if the statute does not prevent a prime contractor from paying its officers a salary, the funds used to pay that salary have to be restored to the trust to pay the subcontractors. That did not happen here.

In short, the fact that the defendant and Steiner each took a $70,000 draw without paying the plaintiff what the plaintiff was owed for materials constituted defalcation.

### b. *Payment of overhead.*

The defendant also committed defalcation by paying Quality's overhead, instead of paying the plaintiff what it was owed.

Quality paid the plaintiff $165,344.62 of what it owed the plaintiff. Docket no. 20 at 15, Plaintiff's Exhibit 3. It did not pay the remaining balance of the debt. The Western District court found that funds that should have been used to pay the remainder of that debt went to pay Quality's overhead costs–estimated in Plaintiff's Exhibit 22 (which was produced in that trial) to be some 24% of its total expenses.

29

In the current case, the defendant argued that at the time of the Western District trial, he and Steiner had miscalculated their overhead, because they'd included in the "overhead" category a number of expenses that really should have been allocated to specific jobs. Accordingly, he argued that if one separated out those job-specific costs, one would see that the remainder of the money the owners had paid Quality had gone into the specific jobs somehow or another, and that under Keyes, that comported with the requirements of §779.02(5). This Court disagrees with that characterization.

The profit-and-loss statement that Steiner produced at the Western District trial was introduced at this trial as Plaintiff's Exhibit 22. After the Western District trial, the defendant and Steiner went through the numbers in the "overhead" category on that exhibit, and subtracted out any expense that they thought was attributable to a specific job. They then assigned those (allegedly) specific job costs to a new category called "Job Variable Costs," in the "Cost of Goods Sold" section of the income statement. Docket no. 23 at 75, Defendant's Exhibit 133.

This "Job Variable Costs" section lists the following categories: "Automobile" costs (consists of Registration, Designer Mileage, Maintenance, and Fuel); "Insurance" costs (consists of Liability Insurance, 183 Bond, 669 Bond, and Workman's Comp); "Labor" costs (consists of Lead Engineer, Engineering Support, Job Superintendent, and Project Manager); "Print Reproduction" costs; "Job Phoone" (sic) costs; and "Tool Repair" costs. Id. The

30

total amount the defendant and Steiner assigned to this new category was $567,925.33.  Id.

The two then calculated the total amount of hours expended for all the jobs Quality had done, and divided the $567,925.33 figure by that total number of hours.  *See, e.g.* docket no. 23 at 8, Defendant's Exhibit 100.  They arrived at a "Cost per Hour" of $15.88.  Id.  Then they calculated how many hours each particular job had consumed, and multiplied the hours per job by the $15.88 figure to arrive at a "Job Variable Cost" figure for each job.  They then added this "Job Variable Cost" to their income statement as a component of Cost of Goods Sold.  Id. at 7.

The defendant argues that this torturous re-engineering of Quality's profit-and-loss statement demonstrates that he did not use trust funds to pay Quality's overhead, but instead put the money into specific jobs.  To the contrary, in this Court's opinion, the defendant's re-engineering of his expenses between the Western District trial and the trial in this case did nothing more than emphasize that, indeed, he'd used the trust funds to pay routine overhead.  Automobile expenses and insurance–two of the expenses he and Steiner subtracted out of overhead and moved to "Job Variable Costs"–are, by very definition, overhead expenses.  Insurance cost does not vary depending on the number of hours expended on a particular job.  Nor do automobile registration and maintenance expenses.  The same is true of "tool repair."

Although it is possible to calculate fuel and mileage expenses on a per-

31

job basis, there is no relationship between the number of hours a particular job consumes and how much fuel or mileage is allocated to that job. The only way to segregate fuel and mileage expenses by job is to keep a record of those expenses, by job, at the time they are incurred–not to go back after the fact (and after having been told that you can't use trust funds to pay overhead), and somehow try to assign a percentage of fuel cost to a job based on the number of hours it took to complete that job.

As for some of the "Job Variable Costs" the two men segregated that could, under a good accounting system, be allocated to specific jobs–labor, or print reproduction, for example–there is no way to know whether, a year or so after the fact, "labor" that the defendant and Steiner attributed to a particular job actually went into that job. The defendant appears to have tried to reconstruct all forty-two jobs from memory in making these allocations, and the result simply is not reliable or credible.

In short, the entire "Job Variable Cost" section is nothing more than an overhead category with a different name. Maybe some of the "Job Variable Cost" were true, job-specific expenses, but there is absolutely no way to identify them, given Quality's poor record-keeping and the way it conducted its accounting. The Court concludes that whether one looks at Plaintiff's Exhibit 22 (the P&L sheet used in the Western District trial) or Defendant's Exhibit 133 (the P&L sheet the defendant prepared for this trial), the result is the same–Quality used trust funds to pay overhead.

Even if the defendant had somehow managed to demonstrate that he'd used the trust funds to pay job-specific expenses, he cannot rely on <u>Keyes</u> to prove that this would have absolved him of liability under §779.02(5). What the <u>Keyes</u> court actually said was this:

> . . . [T]he Keyes ignore the proportionality requirement when they claim that so long as money goes toward the project, payments do not violate the statute. While the Keyes are correct that the money cannot be used for purposes outside the project, that does not end the contractors' responsibility under the statute. Using the money to pay themselves in full while other subcontractors have not been paid proportionally constitutes using money for a non-statutory purpose.

<u>State v. Keyes</u>, 750 N.W.2d at 37-38.

Thus, even if the defendant had proven that he used the trust funds to pay job-specific expenses–which, as discussed above, he did not–he would still be in violation of the statute unless he could show that he paid the plaintiff the same proportion on its debt that he paid on the specific expenses of the jobs. The plaintiff did not prove this.

There is another way to look at the proportionality requirement of §779.02(5)–not whether the defendant paid the plaintiff in the same proportion that he paid himself, but whether the defendant paid the plaintiff the same proportion of its debt as Quality received from the owners. If one looks at the proportionality requirement in this way, one sees that Quality got paid in full on thirty jobs. Quality should, therefore, have paid the plaintiff in full on all thirty of those jobs.

33

The defendant testified that a deficiency existed for eleven (11) jobs, because on those jobs, Quality did not get paid in full by the owners. Under the above view of the proportionality requirement, Quality should have paid the plaintiff proportionally on those jobs. In other words, if the owner of the Goodyear project paid Quality only 40% of what it owed for the materials the plaintiff had supplied, then Quality should have paid the plaintiff 40% of the plaintiff's invoice. Had the plaintiff done that, then–after doing so–perhaps he might have been justified, had he been acting as a subcontractor, in paying himself proportionally.

Quality did not, however, pay the defendant proportionally on the eleven jobs for which it received only partial payment. Steiner testified that Quality paid the plaintiff in chronological order, because the plaintiff had a "revolving" account. So there could have been no correlation, as far as the Court can tell, between how much an owner gave Quality for materials and how much Quality paid the plaintiff.

Nonetheless, in order to determine whether Quality did, in fact, pay Starfire the same proportion of its invoice on each of these jobs as the owner paid Quality, the Court's law clerk engaged in the following exercise: for each of the eleven jobs, she divided the amount of payment Quality received from the owner for the entire job by the total amount due on Starfire's invoice for that job. Next, she calculated for each job the percentage of Starfire's total invoice that the parties agreed Quality had paid to Starfire. She then compared the

34

percentage of each job that Quality had received from the owner with the percentage Quality paid to Starfire.

The result of this mind-numbing exercise, reflected in Exhibit A to this memorandum decision, demonstrates that for each of the eleven jobs, the owner paid Quality anywhere from 49.43% to 99.99% of Starfire's invoice. Yet Quality paid Starfire nothing on the invoices for three of those jobs, as little as 5.4% on one, and in no instance did it pay Starfire the same percentage of its invoice as Quality received from the owner. On three jobs, Quality paid Starfire a larger proportion on its invoice than the owner had paid Quality. In all other instances it paid a smaller proportion.

The defendant tried to argue at trial that he could meet the proportionality requirement if the total amount of money that Quality paid the plaintiff for all jobs was proportional to the total amount of money that Quality received from all owners. In other words, he argued that if one added up all the money that Quality received on all forty-one jobs, and concluded that Quality had received, say, 60% of the total amount the owners should have paid on those forty-one jobs, then Quality was justified in paying the plaintiff 60% of the total amount it was owed. Again, however, the defendant did not demonstrate that Quality received only 60%, or that it then paid the plaintiff 60%. And again, Quality paid Steiner and the defendant, as well as paying its overhead, rather than passing the trust funds on to the plaintiff.

Further, the defendant ignores the fact that materialmen and

35

subcontractors are not the only beneficiaries of the §779.02(5) trust. The owners and general contractors who gave Quality funds also were the beneficiaries of that trust. *See* <u>Matter of Thomas,</u> 729 F.2d at 506. Imagine that the owner of Job X pays Quality 100% of the Starfire invoice. The owner of Job Y pays Quality only 40% of the Starfire invoice. Starfire ought to be able to seek the remaining 60% owed on Job Y from the owner of Job Y. But if Quality used the 100% it received from the owner of Job X to pay Starfire in full for the Job Y supplies, what recourse does the owner of Job X have? It paid 100% of its obligation, yet now finds itself holding the bag for another owner's deficiency.

The defendant's argument is the equivalent of saying, "Well, it all comes out in the wash." But when there are a number of owners providing trust funds for a number of jobs, it doesn't all come out in the wash. That is why the statute created the trust–to protect subcontractors and materialmen from the danger of not getting paid, and to protect owners from having their monies used to pay for things other than the materials to be used in their jobs.

c. *Conclusion*

The defendant's unilateral, conscious decision to pay himself a salary and to pay overhead expenses (poorly disguised for the purposes of the trial in this case as job specific expenses) surpasses the "more than negligence" standard established by <u>Meyer</u>. Paying these expenses before paying the plaintiff constitutes a violation of §779.02(5), and accordingly, the defendant

36

committed defalcation when he did so.

C. **The plaintiff did not prove that the defendant intended to defraud the plaintiff, and thus there is no basis for the Court to award treble damages under Wis. Stat. §895.446(1).**

The plaintiff's prayer for relief asked the Court to find the defendant liable for treble damages under Wis. Stat. §895.80. Docket no. 1, at 3. Section §895.80 was renumbered and amended by 2005 Act 155, effective April 5, 2006; the current version is Wis. Stat. §895.446.

Section 895.446(1) states that "[a]ny person who suffers damage or loss by reason of intentional conduct ... that is prohibited under ... §943.20 ... has a cause of action against the person who caused the loss." Sections 895.446(3)(a) and (c) state: "If the plaintiff prevails in a civil action under sub. (1), he or she may recover all of the following: (a) Actual damages ... (c) Exemplary damages of not more than 3 times the amount awarded under para. (a). No additional proof is required under this section for an award of exemplary damages under this paragraph."

In order to obtain treble damages under §895.446, then, "the victim must prove, by a preponderance of the evidence, the elements of both civil theft by contractor . . . and criminal theft under § 943.20. *See* [*Tri-Tech Corp. of America v.] Americomp* [Services, Inc.], 254 Wis.2d 418, ¶ 24, 646 N.W.2d 822 [Wis. 2002]." KBS Const., Inc. v. McCullough Plumbing, Inc., WL 2008AP1867, 779 N.W.2d 723 at *4 (Wis.App. 2009)(unpublished). "The additional element which a victim of civil theft by contractor must prove for purposes of recovery under § 895.446(3) is criminal intent to defraud." Id. at *5, citing Wis. Stat.

38

§895.446. So, for a plaintiff to recover treble damages in a civil theft-by-contractor action, that plaintiff

> must prove by a preponderance of the evidence that [the defendant] violated [the theft by contractor statute], that [the defendant] possessed the requisite intent to defraud as required by Wis. Stat. § 943.20, and that [the plaintiff] has suffered damage or loss by reason of [the defendant's] intentional failure to comply with [the theft-by-contractor statute].

Id.

The plaintiff did not prove, by a preponderance of the evidence, that the defendant exhibited criminal intent to defraud. While, as discussed above, the evidence demonstrated that the defendant used the trust monies for something other than paying the plaintiff, and while the evidence demonstrated that he did so knowingly, the plaintiff presented no evidence that the defendant intended to defraud the plaintiff. The evidence indicated that the defendant was trying to come up with some way to pay the plaintiff. As the defendant testified, he planned to pay off the IRS, which he thought would enable him to get a bank loan, which in turn he planned to use to pay the plaintiff. While his use of the trust monies was more than negligent and thus constituted defalcation, there is no evidence that it was intentionally fraudulent. Accordingly, there is no basis for the Court to award the plaintiff treble damages.

39

IV.  **<u>CONCLUSION</u>**

For the foregoing reasons, the Court finds that the plaintiff has proven, by a preponderance of the evidence, that the defendant incurred a debt of $92,517.43 (the plaintiff's unpaid balance of $97,158.81, minus the $4,641.38 owed on jobs in which the Court found the plaintiff had failed to prove that a trust existed) by defalcation in a fiduciary capacity, and accordingly, that that sum is nondischargeable in the defendant's bankruptcy pursuant to 11 U.S.C. §523(a)(4).  The Court will enter a separate order to that effect.

#  #  #  #  #

40

# Calculation of Amount due to Plaintiff to make Payments Proportional

| Job Name | Amount Estimated to Owner[1] | Amount Collected from Owner[1] | Amount Owed to Quality from Owner[1] | Percentage Paid to Quality[2] | Total Project Amount Quoted to Starfire[3] | Partial Payments Made to Starfire[3] | Balance Due to Starfire[3] | Percentage Quality Paid to Starfire[4] | Amount Req'd To Make Pymt Proportional[5] |
|---|---|---|---|---|---|---|---|---|---|
| ABC Catalog | $ 36,869.57 | $ 36,550.54 | $ 319.03 | 99.13% | $ 5,150.82 | $ 5,031.96 | $ 118.86 | 97.69% | $ 74.29 |
| Capital Crossing | $ 60,341.82 | $ 57,839.71 | $ 2,502.11 | 95.85% | $ 3,148.40 | $ - | $ 3,148.40 | 0.00% | $ 3,017.85 |
| Goodyear | $ 36,595.75 | $ 32,186.00 | $ 4,409.75 | 87.95% | $ 6,005.55 | $ - | $ 6,354.86 | 0.00% | $ 5,281.89 |
| Green Lake Lodge | $ 83,435.00 | $ 83,074.58 | $ 360.42 | 99.57% | $ 10,713.72 | $ 10,602.51 | $ 111.21 | 98.96% | $ 64.93 |
| Ixonia State Bank | $ 91,956.36 | $ 91,946.36 | $ 10.00 | 99.99% | $ 1,439.27 | $ 77.77 | $ 1,361.50 | 5.40% | $ 1,361.34 |
| Larry Webb | $ 13,150.00 | $ 6,500.00 | $ 6,650.00 | 49.43% | $ 4,269.22 | $ 4,078.05 | $ 191.17 | 95.52% | $ (1,967.79) |
| Luxury Apartments | $ 57,600.00 | $ 51,600.00 | $ 6,000.00 | 89.58% | $ 5,245.95 | $ - | $ 5,435.09 | 0.00% | $ 4,699.50 |
| Pick N Save | $ 52,940.00 | $ 43,767.58 | $ 9,172.42 | 82.67% | $ 9,724.99 | $ 5,861.07 | $ 3,863.92 | 60.27% | $ 2,178.96 |
| Southern Oaks | $ 15,600.00 | $ 14,907.75 | $ 692.25 | 95.56% | $ 2,776.45 | $ 2,754.95 | $ 21.50 | 99.23% | $ (101.70) |
| Village Square N | $ 31,505.00 | $ 31,265.82 | $ 239.18 | 99.24% | $ 6,996.66 | $ 6,673.03 | $ 323.63 | 95.37% | $ 270.51 |
| W. Center | $ 32,200.00 | $ 29,700.00 | $ 2,500.00 | 92.24% | $ 5,693.73 | $ 5,668.39 | $ 25.34 | 99.55% | $ (416.72) |
| Total | $ 512,193.50 | $ 479,338.34 | $ 32,855.16 | 93.59% | $ 61,164.76 | $ 40,747.73 | $ 20,955.48 | 66.62% | $ 14,463.06 |

[1] *See* Docket no. 22, at 98, Plaintiff's Exhibit 21.

[2] Percentage = Amount Collected from Owner / Amount Estimated to Owner

[3] *See* Docket no. 20, at 14, Plaintiff's Exhibit 3.

[4] Percentage = Partial Payments Rec'd by Starfire / Total Project Amount

[5] Amt Req'd to Make Pymt Proportional = Percentage of Payment Rec'd by Quality * Total Project Amount Quoted to Starfire - Partial Payment Already Made

Exhibit A